The next case on this morning's docket is the case of Dickerson v. Midwest Emergency Department Services. We have Mr. Kenneth Burke for the appellee. We have, let's see, I've got to get everything straight here. We have, I'm sorry, Chris Montroy for the appellant. We have Chi Yong Throckmorton for the appellee. Four minutes. I guess you've divided your time. And Ted Dennis will not argue. We have Kenneth Burke to take eight minutes. And we have Mr. Stephen Swofford to take eight minutes as well. With that in mind, you may proceed. Good morning. Good morning. My name is Chris Montroy and I represent the plaintiffs in this case, the plaintiffs' appellates, Millie and Lonnie Dickerson. The plaintiffs present five grounds for this Court to overturn the jury verdict, four of which I have time to address here today. First, the trial court properly admitted evidence that was not habit evidence under Illinois law. Second, both individual defendants violated Rule 213 by disclosing for the first time at a trial new and previously undisclosed factual bases for their opinions and testimony. Third, defendants presented an expert whose beliefs pertaining to the standard of care conflicted with Illinois law. And fourth, the trial court properly admitted speculative expert testimony. Before I address these arguments, I'll briefly discuss the facts. There are a few things that a dentist can do that can kill a person. One of those things is give a patient infective endocarditis. Infective endocarditis is a disease that results when bacteria is introduced into the bloodstream. While everybody has bacteria that is introduced to the bloodstream on a daily basis, persons with certain heart disorders have abnormalities on their heart valve that allow bacteria to colonize on the heart valve. The bacteria grows layer by layer on the heart valve until the heart stops working. And in some circumstances, as in this case, a piece of bacteria breaks off the heart valve and travels to the brain. It's lodged into a vessel and causes an aneurysm. For the most part, only persons with heart disorders are susceptible to infective endocarditis due to the irregular shape of their heart valves. Dental procedures such as extractions are considered high-risk procedures for infective endocarditis because of the large amount of bacteria that is introduced to the bloodstream through bleeding gums. For this reason, the standard of care requires dentists to ask patients whether or not they have heart disorders. Questions pertaining to heart disorders in dental visits and physical examinations of the heart are also key for a physician to diagnose infective endocarditis. On May 14, 1987, Millie Dickerson first visited a defendant dentist, Dr. Mitchell, and that was the only time it was documented that Millie was asked any questions pertaining to a heart disorder. About a year later, on May 19, 1988, cardiologist Daryl Jacobs diagnosed Millie with three heart problems that placed her at an increased risk for infective endocarditis. She was diagnosed with an aortic stenosis, an aortic insufficiency, and a mitral insufficiency. Six years later, on December 8, 2004, defendant dentist Dr. Mitchell extracted eight teeth from Millie. There was no indications in the dental records that Dr. Mitchell took any patient history pertaining to heart disorders, or that he prescribed antibiotic prophylaxis. And Dr. Mitchell testified that he didn't remember anything that wasn't written in the medical records. Millie began exhibiting symptoms of infective endocarditis within days of her extractions. And on January 13, 2005, she visited Dr. Cumberlege. There was no evidence in the medical records that Dr. Cumberlege took any patient history or performed a physical examination related to her heart. And Dr. Cumberlege did not remember anything outside the medical records. Because defendants had no written evidence or memory that they performed the patient histories or physical examinations necessary to satisfy the standard of care, their entire defense at trial was based upon wrongly admitted habit testimony. And this brings us to plaintiff's first argument, that the trial court committed a reversible error by wrongfully admitting what defendants offered as habit testimony. Illinois courts have created three hurdles for litigants to cross before evidence may be properly admitted as habit testimony. First, as this court explained in the leading case on this issue, NET, the Radiatic Braces Incorporated, the proffered habit evidence must concern variably regular acts. This court explained, quote, a semi-automatic and variably regular act is one in which discretion, that is, the study of reflection and choosing between options, however fleeting, present in the decision-making process, has been removed. The conduct that constitutes habit, therefore, takes on characteristics of a ministerial rather than a discretionary act. In this case, the subjects of defendants' proffered habit testimony was not properly admitted because they concerned discretionary medical evaluations, patient histories, physical examinations. At his deposition, Dr. Mitchell admitted that he did not ask the same questions to every patient, that he would tailor his patient histories based upon his patient's medical conditions, that patient histories were obviously different from ministerial tasks, and that he utilized his professional discretion in performing those histories. Likewise, Dr. Cumberlege testified that patient histories and physical examinations he performed changed from patient to patient. Because the evidence defendants offered at trial concerned medical evaluations that changed based upon their professional judgment rather than invariably regular ministerial acts, the trial court erred in admitting defendants' supposed habit testimony. Second, even if defendants' testimony had concerned invariably regular acts, this evidence should have been barred because defendants failed to lay a proper foundation for that evidence. This Court explained in Met that the proffered habit testimony in that case should not have been admitted because, quote, the other instances offered by defendant were not sufficiently detailed and specific so that when, compared to the case at bar, the Court could rule that the situations were so similar that the inference that defendant did no wrong in this case because he had done no wrong in others was not mere speculation or conjecture. Likewise, in this case, defendants failed to lay a proper foundation for the entry and admission of habit evidence by providing specific details with respect to other instances in which the defendants performed actions that conformed to their supposed habits. Without such a foundation, defendants' habit evidence should never have been admitted. Third, as the First District explained in Bulletich v. Bold Law and the Supreme Court explained in Plank v. Holloman, habit testimony is not properly admitted so long as there is direct evidence on the issue. In Plank, the Supreme Court held that habit testimony is improper if there is eyewitness to the circumstances giving rise to the lawsuit. And in Bulletich, the First District held that medical records were direct evidence that precluded the entry of habit testimony. Because there were eyewitnesses and medical records for all of the circumstances that gave rise to this lawsuit, the trial court erred by admitting defendants' proper habit testimony. In response, defendants make three arguments that the testimony that they offered at trial was properly admitted as habit testimony. First, defendants make much ado about Rule 406 of the Federal Rules of Veterans. However, the testimony offered by defendants would not have been admissible as habit testimony even under Rule 406. The Seventh Circuit explained in Thompson v. Ball that habit testimony under Rule 406 must concern uniform behavior and the defendant must provide an adequate sampling of his behavior to demonstrate that the actions in question were more than just a mere tendency. In other words, Rule 406 requires semi-automatic behavior and an adequate foundation for the entry of habit evidence. Accordingly, defendants' proper testimony in this case would have been inadmissible as habit testimony under Rule 406, just as it should have been inadmissible under that. Second, defendants' arguments concerning careful habits fails because evidence of careful habits is different than habit testimony. Evidence of careful habits is admissible to show that a person was a careful person, while habit testimony is offered to show that an individual's actions at the time in question conformed to their habits. In this case, defendants' proper evidence was habit testimony, was offered to show that their actions conformed to their supposed habits, rather than to show that the defendants were careful persons. Third, the admission of evidence concerning both customs and practices is different than habit testimony in both its substance and its purpose. Customs and practices may include discretionary and changing medical acts, such as evidence used to establish the standard of care. On the other hand, habit testimony concerns invariably regular acts, not discretionary acts, and this evidence is used to show that the defendants' actions at the time in question in the lawsuit conformed to his habits. In this case, defendants' testimony was not offered to establish the standard of care, but to show that their actions at the time in question conformed to their supposed habits. Furthermore, the trial court committed reversible error by admitting defendants' offered habit testimony, because this testimony concerned crucial issues in the case. The subjects of the defendants' habit testimony were defendants' patient histories and physical examinations performed by the individual defendants, and the jury was tasked with deciding whether the defendants negligently performed those evaluations. Whether defendants negligently failed to take proper patient history and perform proper patient examinations was included in the jury's instructions. Moreover, defendants emphasized their habit testimony at all stages of the trial, during opening statements, during cross-examination of plaintiff's experts, during St. Elizabeth's employee's testimony, during Dr. Cumberland's examination of his independent expert witness, during Dr. Mitchell's controlled expert witness testimony, during Dr. Mitchell's own testimony, during Dr. Cumberland's own testimony, and during closing arguments. Well, let me ask you a question. Sure. Someplace in the briefs I read that the problem was staphylococcus. Is that correct? Somebody testified. I thought somebody said it was staphylococcus versus streptococcus. I mean, what was it? Oh, okay. Well, there was a rare strain staph that was found on a heart valve. Okay. And basically Dr. Lentino had testified that the bacteria in her system, that her infected enterocarditis was polymicrobial. It was caused by more than one bacteria. Now, was there any other bacteria found, like a streptococcus, something that ampicillin would cure? Isn't that what they premed with, is ampicillin, 500 milligrams? I forgot the precise bacteria that was found in her system. I thought it was. Okay, yes. But, I mean, that was the cause of the infected enterocarditis, that was vegetation. But it was found to be the type of bacteria that is obtained orally. Okay. But would a, you know, even a pick-up load of ampicillin wouldn't affect staphylococcus, would it? It is. I mean, plaintiff's experts in this case, plaintiff's had an infected disease doctor that testified that had mildew-Dickerson received antibiotic prophylaxis. Which would have been what, ampicillin? Which could have been ampicillin or penicillin. Right. Well, she was allergic to penicillin, I thought. That was found in afterwards. Yes, it was found out afterwards that when she was given large doses of penicillin. Well, you wouldn't be receiving a large dose on a premed, wouldn't you? What did you say? Wouldn't you get a large dose on a premed? Like 4.4 times 500 or something like that? Yes, but not the type of dose that is given inconveniously to cure infected enterocarditis. No, but the malpractice, I thought, was a failure to give a premed. It was. And so the premed that would have been given wouldn't have done any good anyhow. No, no, that is not what the plaintiff's experts stated. Oh, I misread it then. So, yes, the plaintiff's experts in this case, we have an infected disease specialist that testified that had she been given the premed. And the premed would have been what? Based on what they knew prior to this. It was unknown that she had infected enterocarditis. So the premed would have likely been what Dr. Mitchell said he always prescribed, which was a penicillin. But he couldn't in this case because he didn't know that, though. Nobody knew that she was allergic to penicillin. But I am unaware as to, I know that the penicillin that was given to her in the hospital was much, intravenously, was a much, much larger dose than that which would have been taken orally. So I don't know if she would have had the same sort of side effects. But if she would have had side effects, it would have been learned that she had an allergy and should have been given a different antibiotic. But your experts said that had they given the premed, which would have been penicillin, that would have prevented this, whatever it was, staphylococcus, that maybe the premed doesn't attack. Yes, yes. Well, the idea behind the premed is that what it does is it basically kills a lot of bacteria and injures other bacteria so it makes it so it does not attach to the heart valve. So the idea, and I believe that I had three separate physicians testify on this issue, that had she been given an adequate premed, that she would not have gotten infected endocarditis to a reasonable degree of medical certainty. In Volatich, the First District explained that a trial court commits a reversible error when it improperly admits habit evidence on crucial issues in this case. Because the proper testimony was concerning defendant's patient histories and physical examinations, because this testimony was crucial to this case, the trial court abused its discretion and the judgment of the court must be overturned. Furthermore, the judgment of the trial court must be overturned because defendants committed various Rule 213 violations. Rule 213 mandates that factual basis opinion testimony be disclosed prior to trial and Rule 213 applies to defendants in the same manner it applies to any expert. In this case, Dr. Cumberlege violated Rule 213 by disclosing supposed habits pertaining to physical examinations for the first time at trial. Likewise, Dr. Mitchell testified that Dr. Mitchell violated Rule 213 by testifying for the first time at trial that with respect to therapeutic and prophylactic dosages of antibiotics and the fact that he gave Mrs. Dickerson a therapeutic rather than a prophylactic dose of antibiotics. Because defendants violated Rule 213 and Rule 213 violations are grounds to reverse trial judgment, the judgment of the trial court must be overturned. Furthermore, the judgment of the trial court must be overturned because the court improperly admitted the opinion testimony of an expert whose standard of care opinions conflicted with Illinois law. During his deposition, Dr. Lentino testified that a physician only violates the standard of care when that physician willfully, purposefully, or recklessly injures a person and he continued by explaining that what he meant by willfully was purposeful or with reckless disregard. However, under Illinois law, a defendant need not act purposefully or recklessly to commit an act of negligence. Because Dr. Lentino's standard of care opinions contradicted Illinois law, the judgment of the trial court must be overturned. Lastly, the judgment of the trial court must be overturned because the court improperly admitted a speculative standard of care testimony. At trial, Dr. Lentino testified that Dr. Cumberlege's physical examinations of Mildred Dickerson satisfied the standard of care because he assumed that Dr. Cumberlege properly listened to her part. Because Dr. Lentino's opinions were based upon assumptions rather than facts, the trial court erred by admitting the speculative opinion testimony and the judgment of the trial court must be overturned. Thank you for your time. Thank you, Mr. Montroy. And for the appellee, we have Mr. Burke proceeding. Good morning. Good morning. My name is Ken Burke. I represent Dr. Mitchell in this appeal. I've got eight minutes, so I'll try and get through the issues that were raised. You don't have to use all eight minutes. I'm sorry? You don't have to use all eight minutes. If I don't need them, I'll yield them to the court. Justice Welch, in response to your earlier question, you're absolutely correct. There was a staphylococcus rare coagulative staph found in the heart valve once it was excised, and my expert, Dr. Lentino, said that this was a polymicrobial infection based on the fact, as you perceive, that Mrs. Dickerson's treatment did not respond until she was given vancomycin in the hospital, which was effective against the staph infection. And Mr. Montroy referenced that his expert, his rebuttal expert, Dr. Pichon, said that giving this ampicillin ahead of time would have affected even the staph. Now, what Dr. Pichon actually testified to was given ampicillin does not kill all of the bacteria that may be in the bloodstream, and if you don't kill all of the bacteria, you're not going to prevent, necessarily, endocarditis from happening. He himself acknowledged he's treated several patients with endocarditis who received endocarditis, got endocarditis following the dental procedure where they had been given the ampicillin, the antibiotic prophylaxis. On the issue of the allergy to penicillin, that came up in the hospital when she was undergoing her treatment, and as was pointed out in the records, we didn't really hit on this in the brief, there was a concern in the hospital records noted by the doctors that the allergy was either to dilating her anti-seizure medication or the penicillin. She had been given penicillin previously by Dr. Mitchell in 2001 without any kind of adverse effects. There was no known allergy to penicillin prior to her extended hospital stay. Briefly on the issue of this so-called 213 violation made by Dr. Mitchell regarding a therapeutic dose versus a prophylactic dose. This came up in connection with a prescription for penicillin given on January 3, 2001, almost four years before these abstractions. As reflected in Dr. Mitchell's records and as reflected in his earlier discovery deposition testimony, he gave this prescription because she had an abscess of two teeth. He was treating the abscess. We brought this up in trial because one of their experts, Dr. Brown, told the jury that this January 3, 2001 prescription was prophylactic. It wasn't, and I think Dr. Brown even acknowledged that later on in cross-examination. It was given to treat the abscess. That's not a basis for any opinion that any of Dr. Mitchell's experts ever gave because it had nothing to do with the dental abstractions eventually involved in this case, which occurred in December of 2004. So I hope I've answered your question, Justice Welch. I'll get on to the habit testimony. In this case, Dr. Mitchell, in his discovery deposition, in our written disclosures, in his trial testimony, says it was his routine. If he hadn't seen a patient in a couple of years, he would ask that patient when they come in, how are you doing? Are you on any medication, any change in your condition? Do you have any heart problems? Do you have any prosthetic joints? He said he did that every time. That's clearly an adequate foundation for that habit testimony. The only time it varied, and Mr. Montroy suggested that this somehow varied on patient to patient, clearly in the testimony, the only time it varied was if the patient would tell him something, he may ask follow-up questions. And that's what's stated in some of the deposition testimony Mr. Montroy quoted. Here's one of Mr. Montroy's questions. You know, within your discretion, you don't ask exactly every single person the precise same medical history about their medical history because persons may have different medical conditions which require specific, individualized follow-up questions. The routine habit testimony we admitted at trial had nothing to do with follow-up questions. It was his same specific, exact questions he'd ask every patient if he hadn't seen that patient in the office. If there was a normal response, nothing changed, nothing would be documented. Their dental expert, Dr. Baxter, testified she didn't document normal findings. My dental expert, Dr. Denny, he says the standard of care doesn't require you to document normal findings. Their emergency room expert, Dr. Matthews, said it's not a breach of standard of care not to document everything and everything doesn't get documented. Clearly, the only way that a dentist or any physician can say what happened years ago if he's not documenting normal findings is what his routine is. You all, I'm certain, have a routine, a habit you follow in resolving an appeal. If 10 years from now somebody were to ask you what did you do in resolving the Dickerson appeal, you'd probably go, I don't remember the Dickerson case, but I probably read the briefs or read a bench memo, and we probably went through the court file, and we had our meeting, we heard the arguments, and we resolved the case. Because it's something you know you do every time you're involved in this. And doctors do it all the time. Of course they do it. The next case was a character case. It involved fairness. It involved a shop steward testifying that the defendant's personnel director was generally fair. Yeah, of course there's no specifics about that. We gave specifics here. And this was proper habit testimony. And Judge Gleason, who tried this case, heard 69 motions in limine filed by the plaintiffs, including a motion on this topic. He read depositions. He read Dr. Mitchell's depositions. He read Mr. Montoy's case law. He read my case law. He ruled that on this issue of updating medical history, that was proper habit testimony. He didn't disallow other habit testimony because there was some variance. He knew the distinction that's cited in the case law. He was sitting there. He heard all these arguments. He disregarded some, and he allowed the specific habit testimony for updated history. And that was within his discretion to do so. And the only way you can find he abused his discretion is to find that no other reasonable person would have made that ruling. Well, other courts have made that ruling, allowed it habit testimony. So clearly that's reasonable. This court in the Bradfield case, I know that case went up to the Supreme Court, and they affirmed it, but they didn't address the 406 issue. But this court, in its Bradfield decision, allowed habit testimony and specifically adopted Rule 406 as being the better rule. I mean, that's quoted right in this court's opinion. That ruling has never, ever been overturned, never been vacated. It's cited by other cases. It's cited by Cleary and Graham's Illinois textbook on habit. I suggest you incite it in the Illinois pattern instructions on habit testimony. Is that it? That's it. It was fast. Thank you, Mr. Burke. Mr. Swofford. Good morning, Your Honors. My name is Cecil Swofford on behalf of Dr. Cumberland and Midwest Emergency Department Services. My client saw Mrs. Dickerson once when she came in with fever, sweats, cough, and was coughing up yellow sputum. She had the history of this fever for three weeks, but she had no fever at the time. It is undisputed that she gave a history of only having seen this dentist two weeks prior to having seen Dr. Cumberlidge while having had the fever for three weeks. So the history was obviously bad that she gave, so he had no reason to connect the dental extractions with the fever. He took a history. He came up with an obvious diagnosis. He conducted an ENT exam. He came up with a really obvious diagnosis of bronchitis and sinusitis, and nobody's saying that it was an unreasonable diagnosis. The criticism is he should have suspected the endocarditis, and that's largely based on the fact that his two daughters said that they told him that she had this floppy heart valve. That's not in the medical records. They never testified to that fact during their depositions, but that was enough to get the case to the jury. It's also based on the fact that he admitted listening to her heart, and the plaintiff's expert said he should have picked up the heart murmur, and if they picked up the heart murmur, then he should have suspected endocarditis. He should have sent her for further testing, and then they may have found the endocarditis, sent her off to the hospital, and they didn't. I'm not saying the plaintiff obviously did enough to get the case to the jury, but it's also pretty obvious here that it was enough that the jury had no trouble rendering him not guilty. Not only that, but the testimony was also clear, but by the time my doctor saw her, her valves were already needed replacing, and the plaintiff's experts couldn't even say that her aneurysm wasn't already too far along, that it wouldn't have bled out anyway. I'm just putting the matter in context because the plaintiff didn't make his case. The case should have gone to the jury, but it was a pretty limited case against my doctor to begin with. He had a very obvious diagnosis to make, and it would have been pretty remarkable had he suspected endocarditis under these circumstances. The plaintiff's two arguments against my client were the admission of this habit evidence, the so-called habit evidence, and the so-called violation of 213. I think in large part the habit evidence argument, why I doubt everything Mr. Burke said, I think the habit evidence is a pretty semantic argument with regard to my client because with one exception, all the habit evidence that was supposedly improper that we introduced on behalf of my client was my client just testifying to what his medical records meant based on his customs and practices. Now, true, when we asked the questions, the questions were also framed as, what was your habit, custom, and practice when you filled out your medical record? But he was just testifying to his customs and practices. What does it mean here when you checked ENT under examination? What does it mean here when you checked off CV like part of the ASCO and normal on the medical records? You know, that's not habit. You're testifying to his customs and practices. It seems impossible to me how you could even try a medical malpractice case unless the doctor was able to testify to his customs and practices or habits with regard to filling out his medical records. You just couldn't try the case. So I don't see how it was inadmissible. The only habit, arguable habit testimony that he testified to, divorced from the medical records, was how he normally conducts a history. And that was that he asked general questions of his patients, like, what are your medical problems? Have you had medical problems in the past? Are you being traded for anything now? Are you taking any medications? Are you being seen by another doctor? Okay, those are things that are not in the medical records, or those are things that he wasn't testifying to based on the medical records. But I don't see how those were, like, crucial issues in the case, how testifying to his habits as to how he takes a history affected the outcome in this case. How him testifying to his habits as to how he took a history affected the outcome in this case. So I don't see how they could possibly give rise to any prejudice to the plaintiff in this case and furnish any basis for reversal in this case. And I don't see how that evidence should be, that kind of background evidence should always be admissible in a case like this. As to his 213 objections, I really detailed in my brief, and I'm not going to re-argue him, linking up where he made the disclosures of things he's complained where he didn't make disclosures. For instance, in the depositions, Dr. Cumberlege, he didn't specifically say in the deposition that he listened to Mrs. Dickerson's heart, but he did say he was asked about a CV exam, and he said he listened to her chest. Okay, I have the site there. There's only one thing that's not in the depth of Dr. Cumberlege that is in the testimony, and that's that he conducted an ear, nose, and throat exam. That's not in the depth, and it's not in the disclosures, but it is in his testimony. It's in the testimony that he checked her lungs, and it's not in the depth. But, you know, I don't see... It is in the medical records that he conducted the ENT examination, and once again, where's the prejudice that he conducted an ear, nose, and throat exam? He came to a diagnosis of bronchitis. And so I just don't see where the plaintiff is going with any of this argument on prejudice or crucial issues. In each case, it's in the records, the diagnosis, the ENT exam. All of the evidence about which the plaintiff is complaining that was a so-called violation was cumulative in the case of whether or not Dr. Cumberlege was into the heart. He ended up using that against my client by saying he failed to discover the murmur. Thank you, Your Honor. Thank you, Mr. Solkert. Ms. Brock-Martin, you have four minutes, and that is going to fly by. My argument will be very brief. May it please the Court? My name is Cheyenne Brock-Martin. I represent St. Elizabeth's Hospital in this appeal. St. Elizabeth's Hospital was sued as an defendant. Plaintiffs alleged that Dr. Cumberlege was the apparent agent of St. Elizabeth's Hospital when he provided care to Ms. Dickerson at the urgent care in January. At the conclusion of the trial, the jury returned a verdict in favor of St. Elizabeth's Hospital. A special interrogatory had been submitted to the jury on behalf of the hospital, asking the jury to make a finding as to whether Dr. Cumberlege was an apparent agent of St. Elizabeth's Hospital. The jury returned the special interrogatory, indicating and finding that Dr. Cumberlege was not an apparent agent of St. Elizabeth's Hospital. Initially, I would just like to point out to the Court that the plaintiff's brief does not specifically mention St. Elizabeth's Hospital or the verdict that was rendered in favor of St. Elizabeth's Hospital. However, there was some mention about the relationship between Dr. Cumberlege and MEDS, which was the entity that provided physician coverage at the urgent care. So, for the sake of thoroughness, I would just briefly would like to reiterate that on behalf of St. Elizabeth's Hospital, we would request the Court to affirm the verdict in favor of St. Elizabeth's Hospital. I don't have any further arguments. If you have any questions, I'd be happy to address those. And also, we would adopt the arguments made on behalf of Dr. Cumberlege in the sense that he's asserted to be our apparent agent. Thank you for the question. Mr. Montroy, you have the opportunity to rebut. If you'll give me a minute to get back to what was mentioned by Judge Welch. I suppose that one failing that I had in my brief is I addressed my statement of facts to issues and the arguments on appeal rather than making my arguments  One thing that I did not mention in the brief that is apparent in the record was that we had three separate doctors, actually three different doctors that testified that had Mrs. Dickerson received appropriate antibiotics, that she would have not developed infective endocarditis. Those doctors were Dr. Pichon, Dr. Brown, and Dr. Matthews. That is a prophylactic amount or a therapeutic amount? That she would receive a prophylactic amount. Now, as far as the issue of counsel stated, that there was at no time was it stated that Dr. Mitchell gave a prophylactic amount and that was not the basis of any opinions. I'm going to read to you from Dr. Mitchell's April 12, 2007 disclosure. It was disclosed that Dr. Denny, which was the controlled expert for Dr. Mitchell, would testify that, quote, the antibiotics that Dr. Mitchell testified that he prescribed prior to the extractions would have been sufficient and adequate endocarditis prophylaxis and would comply with the standard of care. And that is at A30 in the appendix. So the difference between therapeutic and prophylactic antibiotics was a bit of a surprise to trial and that's where it came up for the first time and, in fact, contradicted the prior expert testimony. As far as the opinion testimony that Dr. Lentino gave that the infective endocarditis was polymicrobial, he testified during his deposition that that opinion was not made to a reasonable degree of medical certainty. So he basically withdrew that opinion. Now, something interesting that Dr. Mitchell, the attorney, did was he characterized patient histories as something that is his routine, that he asks the same questions every time. The job of a dentist, the job of a physician, isn't something that is routine and requires the exercise of a lot of medical judgment. And that is also what I believe Dr. Cumberlege's expert said, that patient histories and the type of physical examination and the type of patient history that is taken all depends upon medical judgment of the professional. They change it, they vary it from patient to patient. This isn't you show up and you do the same thing every time the patient has certain conditions. You need to take certain steps. You need to ask different follow-up questions to find out what's going on. I believe that Dr. Cumberlege said that patient history is one of the most important parts of the most important tools that a doctor has to determine what's going on with somebody. So this isn't something that is easy. It's always placing letters in an envelope, licking the envelope and dropping it in the mail. This is something that requires a lot of judgment and changes from patient to patient. When we go back to Rule 406, which Illinois and Miami recently has new evidence laws, but the fact of the matter is that while under Rule 406 habit testimony is relevant, the actions and issues in this case were not true habit testimony because they weren't invariably regular and because they required a lot of discretion. So even under Rule 406, they would have not been admissible. Mr. Swofford stated that he didn't understand how the issues, how Dr. Cumberlege's actions and testimony concerning patient histories and physical examinations were crucial to this case. At trial, we had Dr. Shooter, who's a neurologist in St. Louis, a Washington neurologist, come in and testify that if Mildred Dickerson had been given, had been properly diagnosed by Dr. Cumberlege, had been timely diagnosed, that she would not have had an aneurysm, a piece of bacteria break off and travel to her brain and cause an aneurysm. So the way that she would have been properly diagnosed is if she had been asked questions about her heart and if Dr. Cumberlege had performed a proper physical examination of her heart. You can finish your thought. At trial, Dr. Cumberlege testified. Dr. Lentino testified that he must listen to the heart in multiple places to determine whether or not an individual has a heart murmur. And Dr. Cumberlege testified that he made the mistake of only listening to the heart in one place, and because of that, he did not, he missed the heart murmur and her heart throb. Thank you. Thank you. Thank you all for your briefs and arguments, and we'll take a nap.